UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMIGDIO GUZMAN OJEDA,<br><br>        Petitioner,<br><br>    v.<br><br>SCOTT FRAUENHEIM,<br><br>        Respondent. | No.  1:16-cv-01588-DAD-SKO HC<br><br>**FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**<br><br>**(Doc. 1)** |

Petitioner, Emigdio Guzman Ojeda, is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner raises one ground for habeas relief: ineffective assistance of counsel.  The Court referred the matter to the undersigned pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  Having reviewed the record and applicable law, the undersigned recommends that the Court deny habeas relief.

# I.    <u>Procedural and Factual Background[1]</u>

Petitioner shot and killed his ex-wife, Flor Sanchez ("Sanchez"). On the day of the shooting, Sanchez's son, Peter Garza ("Garza"), was watching his cousin play videogames when another cousin yelled that Sanchez had returned from the grocery store. Garza walked to the front door to help his mother bring the groceries into the house. Garza could see her with groceries bags in her hands. Through the living room window, Garza also saw Petitioner standing in the front yard, and then heard three gun shots. At the time of the shooting, Garza did not see Petitioner standing with Sanchez.

Garza grabbed a knife from the kitchen, ran out the front door, and charged at Petitioner. Garza tried to stab Petitioner with the knife, but dropped the knife as he struggled with Petitioner. Garza asked Petitioner why he shot his mother. Petitioner told Garza to call the police, and said that he wanted to die and stated that Sanchez had cheated on him. Garza eventually let Petitioner leave to tend to his mother, who was lying on the ground near the porch.

After the shooting, Petitioner drove to his house and called the emergency operator and stated he wanted to kill himself. The call with the emergency operator lasted until a SWAT team arrested Petitioner. During his phone call with the emergency operator, Petitioner spoke to three police officers, including Silver Rodriguez ("Rodriguez"), a Porterville Police Captain.

In a search of Petitioner's house, police officers discovered a binder on the kitchen table with what appeared to be apology notes to various individuals, bills that needed to be paid, bank statements, and photographs. Other notes with instructions, including life insurance policies, were also found inside the house. On the wall of one bedroom, there was writing which said, "Till death do we part."

---

[1] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Ojeda*, (No. F069236) (Cal. Ct. App. Dec. 17, 2015), is presumed to be correct. 28 U.S.C. § 2254(e)(1).

An autopsy revealed Sanchez had four wounds that were caused by three bullets. She had an entrance wound to her left chest, from which a bullet was recovered. The bullet had traveled through her heart and lung. There was no powder tattooing or stippling to the entrance wound, indicating that it was not a contact or near-contact wound. The gun could have been as close as inches away from Sanchez.

A second wound was found on the back of Sanchez's right hand. The bullet appeared to fragment, and a portion exited near her wrist, causing a third wound. There was no powder tattooing, burns, or stippling to these wounds; therefore, they were not contact or near-contact wounds.

The fourth wound was to the head. The bullet penetrated the skin, but did not penetrate the skull. There was no stippling or gun powder burns on Sanchez's head.

Sanchez's cause of death was determined to be exsanguination from the gunshot wound to the chest.

At trial, the prosecution presented evidence of two prior domestic violence incidents involving Petitioner. Gina Duran ("Duran") testified she lived across the street from Sanchez on the day of the shooting. She had been involved with Petitioner approximately 20 years earlier. In 1991, after Duran broke up with Petitioner, he followed her to a night club and threw a rock at the truck in which she was riding. On two occasions within a month of the shooting, Duran observed Petitioner hide behind trash cans and look through the windows of Sanchez's home.

Porterville Police Detective Manual Franco ("Franco") testified that five months before the killing, in March 2011, he was dispatched because Sanchez's two rear tires on her vehicle were flat and appeared to have been slashed. Franco contacted Petitioner, who admitted he slashed Sanchez's tires with a knife. Petitioner claimed he slashed the tires because he had paid for them and Sanchez would not reimburse him. A court issued an emergency protective order, which

Franco gave and explained to Petitioner. When he was detained for shooting Sanchez, Petitioner told a different officer he had slashed Sanchez's tires because he was jealous.

Petitioner testified in his own defense. He explained that two or three months before killing Sanchez, he had stopped working because he was depressed as a result of his failed attempts to reunite with Sanchez. He felt that Sanchez was leading him on by spending time with him and encouraging him to take steps so that they could reunite, but then refused to resume a relationship with him. He stated that one day Sanchez would talk to him, but the next she would not, and claimed he wanted Sanchez to leave him alone.

On the day of the killing, Sanchez stopped by his house in the morning to check on him. When Petitioner told Sanchez he had not eaten in several days, she invited him over to her house for a meal around lunch time.

After Sanchez left, Petitioner returned to his bed and cried. At the appropriate time, he got up and went to Sanchez's house. Before he left, Petitioner took several pills and drank half a bottle of wine. Petitioner took his gun with him because he had "decided already I was tired of her playing with my mind and I was going to end my life there at her house that day." Petitioner planned to shoot himself at Sanchez's house so the house and Sanchez would be haunted by him.

When Petitioner arrived at the house, he sat on a small fence and cried while waiting for Sanchez to return home. Sanchez arrived, waived at Petitioner, and began unloading groceries from the trunk of her vehicle. When Sanchez asked Petitioner why he was crying, he replied that he had lost everything so he was going to commit suicide. Sanchez said no and started yelling for her son.

Petitioner pulled the gun out of his waistband and aimed it at his neck, but nothing happened when he pulled the trigger. Petitioner opined that the gun did not initially fire because the safety was activated, but he believed he deactivated the safety either just before or during the struggle.

4

Sanchez tried to grab the gun and the two struggled for it. During the struggle, the gun went off three times, striking Sanchez each time. Petitioner never let go of the gun because he wanted to shoot himself.

When Sanchez's son, Garza, attacked Petitioner with a knife, Petitioner said "I am sorry this wasn't supposed to happen." Petitioner told Garza to call for an ambulance and then fled from the area so that he would not cause any more problems.

After leaving Sanchez's house, Petitioner took more pills, hoping to die. He heard the police arrive and eventually called the emergency operator. Petitioner did not remember the course of events after calling the emergency operator, including his arrest.

On cross-examination, Petitioner admitted he slashed Sanchez's tires and admitted he was served with a protective order. However, Petitioner claimed he and Sanchez still planned on getting back together in the future.

A second witness, Alan B. Barbour ("Barbour"), a forensic toxicologist, also testified on behalf of Petitioner. Barbour testified the blood tests performed at the hospital after the shooting indicated that Petitioner had high levels of various drugs in his system.

A jury found Petitioner not guilty of first degree murder, but guilty of the lesser offense of second degree murder (Cal. Penal Code § 189). The jury also found firearms enhancements that were charged against Petitioner to be true. (Cal. Penal Code §§ 12022.5(a), (d); 1192.7(c)(8); 12022.53(b), (c), & (d)). Further, the jury found Petitioner guilty of two misdemeanors: (1) possession of a firearm when prohibited from doing so (Cal. Penal Code § 12021(g)(2)), and (2) misdemeanor disobeying a domestic relations court order (Cal. Penal Code § 273.6(a)). The jury could not reach a verdict on a misdemeanor resisting/obstructing a police officer charge (Cal. Penal Code § 148(a)(1)), and the charge was dismissed. The Court sentenced Petitioner to the statutorily mandated term of 15 years to life, enhanced by a term of 25 years to life because he used a firearm,

for a total sentence of 40 years to life.

On December 17, 2015, the California Court of Appeal ("Court of Appeal") affirmed Petitioner's conviction. The California Supreme Court summarily denied Petitioner's petition for review on March 1, 2016.

Petitioner filed his petition for writ of habeas corpus with this Court on October 21, 2016. Respondent filed a response on January 24, 2017, and Petitioner filed a reply on March 27, 2017.

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state

court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

III. **The State Court Did Not Err in Denying Petitioner's Ineffective Assistance of Counsel Claim**

Petitioner alleges trial counsel was ineffective because she did not protect Petitioner's due

process rights against prejudicial *Doyle*[2] errors.  (Doc. 1 at 2.)

In *Doyle*, the Supreme Court held that post-arrest silence after *Miranda*[3] warnings cannot be commented upon or used by the prosecution.  *Doyle v. Ohio*, 426 U.S. 610, 611 (1976).  "[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."  *Id.* at 618.  However, the Supreme Court has found no *Doyle* violation if the trial court promptly sustains a timely objection to the question concerning post-arrest silence, instructs the jury to disregard the question, and provides a curative jury instruction.  *Greer v. Miller*, 483 U.S. 756, 765-67 (1987).

### A.  Standard of Review for Ineffective Assistance of Counsel Claims

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  "[T]he right to counsel is the right to effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 688, 694.  The *Strickland* test requires Petitioner to establish two elements: (1) his attorneys' representation was deficient and (2) prejudice to Petitioner.  Both elements are mixed questions of law and fact.  *Id.* at 698.

//

---

[2] *Doyle v. Ohio*, 426 U.S. 610 (1976).
[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

**B. State Court of Appeal Opinion**

The Court of Appeal rejected Petitioner's argument that his trial counsel was ineffective. First, the Court of Appeal described the Supreme Court's finding in *Doyle*,

> The only issue is whether prejudicial error occurred pursuant to the principles established in *Doyle v. Ohio* (1976) 426 U.S. 610. FN1 Doyle and his codefendant Wood were convicted of selling marijuana to a police informant. They were arrested after the transaction occurred and given warnings pursuant to *Miranda v. Arizona*, (1966) 384 U.S. 436. Apparently neither of the defendants in *Doyle* answered any of the questions posed by the police.
>
> > FN1 [Petitioner] frames his argument as ineffective assistance of counsel. For clarity, we will address the issue directly as the same result would be reached regardless of the approach taken.
>
> In separate trials, both of the defendants testified the police informant's testimony was false. What actually occurred, according to the defendants, was the informant attempted to sell marijuana to the defendants. On the way to complete the transaction, Doyle decided he only wanted to purchase a fraction of the agreed-upon amount. Doyle informed the informant he had changed his mind when they met to complete the transaction. The informant became angry, threw money into Doyle's vehicle, and drove away with the marijuana.
>
> Neither of the defendants were ever told anyone associated with law enforcement this version of the events before trial. During cross-examination, the prosecutor repeatedly confronted the defendants with this fact. The defendants appealed, and the Supreme Court concluded *Miranda* required reversal. "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. [ ] Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle v. Ohio*, *supra*, 426 U.S. at pp. 617-618, fns. Omitted.)

*People v. Ojeda*, (No. F069236) (Cal. Ct. App. Dec. 17, 2015), at 6-7.

After explaining the Supreme Court's holding in *Doyle*, the Court of Appeal analyzed Petitioner's argument that his Due Process Rights were violated based on several *Doyle* violations during his trial:

> [Petitioner] alleges the prosecutor violated *Doyle* by asking on cross-examination if he had ever explained to the police that Sanchez was shot accidentally. In addition, [Petitioner] asserts comments by the trial court compounded the error. The relevant proceedings occurred during the cross-examination of [Petitioner], the prosecutor's closing argument, and in response to a question posed by the jury.
>
> During cross-examination, the prosecutor pointed out that [Petitioner] left after he shot Sanchez instead of waiting to talk to the police. The following then took place:
>
> > "[Prosecutor:] You didn't stick around to explain to the police this was a horrible accident, I never meant for her to get shot, correct?
> >
> > "[Petitioner:]  No, I didn't.
> >
> > "[Prosecutor:] In fact the first time you are ever telling anybody that this was an accident was here in open court today, correct?
> >
> > "[Petitioner:]  Well –
> >
> > "[Prosecutor:] Let me rephrase my question.  You never before today in open court told a police officer, a detective, a DA investigator, a Judge, anybody that this was an accident, correct?
> >
> > "[Defense Counsel:] I would object to this.  Talking to the DA, investigator, judge, I mean that is inappropriate people he could talk to.
> >
> > "THE COURT:        I am going to allow the question that he didn't stick around and tell anybody that it was an accident.  I am going to allow that. But getting into specifics as far as law enforcement – well I am going to allow it because he was Mirandized and he did make a statement to law enforcement.
> >
> > "[Defense Counsel:]  My objection was to specifically the judge, DA, investigator.
> >
> > "THE COURT:        Okay.  But he was interviewed by law enforcement. He did make a 911 call and so there were opportunities for him to say that and I will allow that examination.  But regarding telling the judge, he has already got an attorney, so Miranda, he is not allowed to talk to anybody.

But in those instances where he is allowed to talk to somebody and the fact that he didn't I am allowing that. Do you understand what I just said?

"[Prosecutor:] I believe so.

"[Prosecutor:] When you, let me word this correctly. You didn't stick around and tell police at the scene what happened, correct?

"[Petitioner:] Correct.

"[Prosecutor:] And you never told law enforcement that this was an accident, correct?

The prosecutor then asked if [Petitioner] told the emergency operator the shooting was an accident, but [Petitioner] claimed a lack of memory.

During her closing argument, the prosecutor argued there was no evidence to support [Petitioner's] claim of an accident, and that the physical evidence was not consistent with an accident shooting. She then commented, "[t]here was just no accident. All of the evidence points that he had this thing planned out and nothing supports his argument that this was an accident except his self serving statement that he mentioned for the first time ever on the stand today." Defense counsel did not object to this statement, and the prosecutor did not make any further reference in closing or rebuttal argument to [Petitioner's] trial testimony being presented for the first time at trial.

The third incident occurred during jury deliberations when the jury sent a request to the trial court . . . to see the "police reports of [Petitioner's] interview." . . .

The trial court's response to the request for the police report is where the claimed error occurred. Initially, the trial court told the jury it could not see the police report because it was not entered into evidence. The trial court then expanded on its answer:

"THE COURT:      [¶] . . . [¶] There was no interview of the [Petitioner] unless you want the interview regarding the slashing the tires case, but he wasn't interviewed. The only testimony you have from the [Petitioner] is what he is testified to up here and what's on the 911 tape, that's all.

"JUROR #7:      To clarify, related to the police reports then there is no interview of [Petitioner]

"THE COURT:      No.

"JUROR #7:      Okay.

"THE COURT:      He didn't want to talk to them.

"JUROR #7:        Okay.

"THE COURT:        Which is his right.  And so what you have is his testimony and what's on the 911 tape or disk."

The trial judge was required to leave the courthouse shortly thereafter.  The attorneys, however, were uncomfortable with the above colloquy, so [a different judge] was brought in to address the issue.  After discussing the matter with the attorneys, the jury was brought back into the courtroom and provided with an additional explanation:

"An issue has risen that we feel appropriate to give you an explanation on and in order not to delay your deliberations until we find out when [the trial judge] will be able to return, I have spoken with the attorneys and I hope I can clear this issue up for you.

"There was apparently a request from the jury for a police report that might have been some reference to during your trial.  The police report is not in evidence and I believe [the trial judge] has told you it is not in evidence, so you don't consider it.

"I was further informed that the reasons for that request was there was a possible statement of [Petitioner's] in that police report.  That also is not in evidence, obviously as part of that.  I need to inform you that whether or not a statement was made or any reason for such is not in evidence so whether or not a statement is made or whatever reason for making it or not making it is not to be considered by you, by the jury for any purpose.  Does that clarify it?  All right.  Hopefully you can get back to your deliberations and we don't have to delay you."

Defense counsel moved the trial court for a mistrial based on the trial court's comments about [Petitioner's] failure to give a statement to the police.  Defense counsel argued the error could not be cured and a mistrial was required.  The trial court denied the motion.

From these facts, [Petitioner] argues *Doyle* error occurred.  We are not certain there was *Doyle* error.  This is not as clear a case as *Doyle* because [Petitioner] did talk to the police after he shot Sanchez but before he was arrested.  When [Petitioner] called the emergency operator, he eventually spoke with Captain Silver Rodriguez.  When the SWAT team arrived at [Petitioner's] house for the arrest, the phone call was transferred to Sergeant Jay Costello.  Because there were conversations between [Petitioner] and police officers wherein [Petitioner] had the opportunity to explain that the shooting was accidental and [Petitioner] never gave such an explanation, these conversations were proper areas of inquiry by the prosecutor both during the cross-examination of [Petitioner] and during closing argument.

However, the prosecutor's questions and comments were not as focused as they could have been.  Had she made it clear she was limiting her questions and

comments to the conversations that occurred before [Petitioner] was arrested, then this issue would have absolutely no merit. Because she did not, it is arguable whether *Doyle* error occurred.

The trial court's comments and ruling were, for the most part, correct; however, the court could also have been more clear when speaking to the jury by informing them there was no evidence that [Petitioner] was interviewed by the police after he was arrested, and the jury could not consider that issue for any purpose. The trial court was correct that the fact [Petitioner] left the scene without telling anyone the shooting was an accident was a proper area of inquiry, and, as stated above, that the prosecutor could inquire about [Petitioner's] failure to explain the shooting was an accident when he spoke to the police before he was arrested.

We need not decide if *Doyle* error occurred, however, because, even if error occurred, it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) We begin our analysis by once again acknowledging this was not a case like *Doyle* where there was no evidence before the jury that the defendant had spoken to police officers at any time before trial. [Petitioner] spoke with two officers before he was arrested, and his failure to inform them in these conversations that the shooting was accidental was very relevant. Accordingly, the prosecutor's attempts to inquire into this area were proper. Moreover, the trial court explained to the jury that it was [Petitioner's] right to refuse to speak to the police after he was arrested, and the jury was instructed by [the Judge] that it was not to consider for any reason the fact that [Petitioner] did not give a statement to the police. For all of these reasons, the discussions about [Petitioner's] failure to explain his accident theory was much less harmful than it might otherwise have been.

However, the primary reason for finding [Petitioner] did not suffer any prejudice is that the evidence against him was overwhelming. Garza, who was as close an eyewitness to the shooting as there was, did not observe a struggle between [Petitioner] and Sanchez before Sanchez was shot. The lack of any stippling around the wound suffered by Sanchez strongly suggests the shots were not fired from close range. [Petitioner's] flight and failure to explain to anyone that the shooting was accidental also are strong indications that the shooting was not accidental. The statement [Petitioner] wrote on the wall of his house, "Till death do we part," is again an indication that he intended to, and did, kill Sanchez. [Petitioner's] testimony that the gun failed to fire twice when he attempted to shoot himself was simply unbelievable. According to [Petitioner], the first time he tried to shoot himself, the safety was on, but he was able to disable the safety when Sanchez began struggling with him. If [Petitioner's] intent was to commit suicide, one would expect he would not disable the safety when Sanchez began struggling for the gun. Moreover, his claim that after he successfully fired at least three shots at Sanchez the gun jammed when he tried to shoot himself could reasonably be interpreted by a jury as fabrication, rendering his testimony much less credible.

The most compelling evidence of [Petitioner's] guilt, however, came from his own mouth during his conversations with the emergency operator, Captain Rodriguez,

and Sergeant Costello.

When he first called the emergency operator, [Petitioner] informed the operator there were police at his house. When the operator asked what happened, [Petitioner] responded, "I just shot my ex-wife." He did not say he accidentally shot Sanchez. [Petitioner] then stated "I have a gun to my head. Uh, my wife cheated on me. I forgave her. She said she would come back to me. She never did. I went into depression. I tried to overdose. I love her too much, I can't live in this world anymore. I took like 50 pills of prescription medication, 30 minutes ago. I have a gun to my head. I don't wanna kill anyone innocent. I just want them to kill me, 'cause I don't wanna hurt anyone innocent.'" When asked what medication he took, [Petitioner] said he took everything he could find, asked the police to do him a favor and kill him, and said "I won't hold it against nobody. I just don't wanna kill anyone that was an innocent. No one that broke my heart. I tried to do everything with my wife. [¶] . . . [¶] And she betrayed me with another guy. But I can't live, I lost my home, I lost my business. I just don't want to live in this hell anymore."

At this point, Rodriguez began speaking with [Petitioner]. The beginning of this conversation reflects Rodriguez's attempt to obtain information from [Petitioner] about his current circumstances, and to assure [Petitioner] that the police did not want to shoot him. When Rodriguez asked [Petitioner] how the standoff could be ended peacefully, the following occurred:

> "[Petitioner]: I want my wife to take me back, she still loves me.

> "[Rodriguez]: I know but you can't right now, you can't do that, did you hurt her?

> "[Petitioner]: I think I shot her."

Rodriguez kept talking to [Petitioner], spending most of the time trying to calm him and assuring him the police wanted the standoff to end peacefully, [Petitioner] kept repeating he wanted to die. As he was talking to [Petitioner], Rodriguez asked [Petitioner] where he shot Sanchez. [Petitioner] replied, "I don't know, I thought I shot her in the stomach." Rodriguez then asked why [Petitioner] shot Sanchez. [Petitioner] said they were trying to work out their problems. Rodriguez commented that shooting Sanchez in the stomach would not help to work out any problems they may have had. Rodriguez kept talking to [Petitioner], again trying to keep him calm.

At this point, Rodriguez transferred the call to Costello. Costello began by asking [Petitioner] what was happening. [Petitioner] replied he was depressed, hadn't eaten for days, couldn't live without Sanchez, and wanted to die. Costello assured [Petitioner] the police wanted to keep him alive. [Petitioner] continued with his explanation:

> "She told me she loves me and she just needed time to get over the hurt and

14

then she backstabbed me, she started dating some other [guys] she told me she wants nothing to do with me, and you know, I did everything she told me to do, I went in counseling, I quit doing all the bad things for her, for six months, and I was just really hurt, betrayed. [¶] . . . [¶] I just can't live without her. [¶] . . . [¶] That's pretty much, I just, I just can't live every day without her unless I'm drugged or drunk, I sleep all day, I sleep all night, I lost my business, I had a good lawn service, and now nothing cared, nothing I care about is being with her and being happy again."

While Costello was trying to talk [Petitioner] into walking out of the house, [Petitioner] asked about Sanchez. [Petitioner] then said he wanted to talk to her, but Costello said he did not know where she was. [Petitioner] replied, "I want to tell her I'm sorry, I'm just not [in] control, of what she told me and, I just love her so much, that I can't live without . . . ." After more conversation, [Petitioner] finally surrendered to the police.

There are the relevant passages of the call made by [Petitioner] to the emergency operator. He never suggested the shooting was an accident, instead admitting he shot Sanchez because she would not reconcile with him and, in his view, she had cheated on him. While acknowledging that [Petitioner] had taken an excessive amount of medication before the phone call, the entire transcript reveals he was coherent enough to understand what he had done and what was going on at the time. The fact [Petitioner] never suggested to anyone that Sanchez was accidentally shot when they struggled over the gun and his admission that he shot her is very compelling evidence the shooting was not accidental.

The testimony of the independent witnesses, the physical evidence, the call to the emergency operator, and [Petitioner's] own testimony each provides persuasive evidence that [Petitioner] was guilty of killing Sanchez. When taken together, the evidence of [Petitioner's] guilt is overwhelming. Accordingly, we conclude that if *Doyle* error occurred, the error was harmless beyond a reasonable doubt.

*Id*. at 7-15.

In sum, the Court of Appeal found that even if *Doyle* errors were committed during trial, any errors were harmless based on the overwhelming evidence that Petitioner intentionally shot Sanchez.

### C. **The State Court Did Not Err in Rejecting Petitioner's Ineffective Assistance of Counsel Claim**

Here, Petitioner alleges ineffective assistance of counsel based on three alleged *Doyle* errors: (1) failure to object during cross-examination; (2) failure to object to the prosecutor's closing argument; and (3) deficient motion for mistrial. (Doc. 1.)

15

As explained thoroughly by the Court of Appeal in its opinion, Petitioner maintains trial counsel should have objected to the prosecutor's cross-examination of him when questioning why Petitioner did not tell anyone before the trial that the shooting was an accident. *Id*. at 41-42. Petitioner states his counsel should have objected to the prosecutor's statement during closing argument that "nothing supports [Petitioner's] argument that this was an accident except his self serving statement that he mentioned for the first time ever on the stand today." *Id*. at 42. Finally, Petitioner argues trial counsel was ineffective when she improperly moved the court to declare a mistrial based on a *Griffin* error,[4] instead of a *Doyle* error, because the jury heard that Petitioner refused or declined to make a statement in a police interview. *Id*. at 45.

In *Doyle*, the petitioners were arrested for selling marijuana and were advised of their constitutional rights. The petitioners remained silent when speaking to officers, but testified at trial that a police informer had framed them. *Doyle*, 426 U.S. at 611-13. During cross-examination, and over objections, the prosecutor asked each petitioner whether he had told the police he had been framed. *Id*. at 613-14. The Supreme Court held this questioning of the petitioners' post-arrest silence after they received *Miranda* warnings violated their Due Process rights. *Id*. at 611. Here, by contrast, the prosecutor impeached Petitioner with his pre-arrest statements.

The following colloquy took place during the prosecutor's cross-examination of Petitioner:

Prosecutor:    You didn't stick around to explain to the police this was a horrible accident, I never meant for her to get shot, correct?

Petitioner:    No, I didn't.

Prosecutor:    In fact the first time you are ever telling anybody that this was a accident was here in open court today, correct?

Petitioner:    Well –

---

[4] In *Griffin*, the Supreme Court held that the Due Process Clause prohibits a prosecutor from commenting on a defendant's decision not to testify. *Griffin v. California*, 380, U.S. 609, 615 (1965). As Petitioner testified in this case, counsel should have moved for a mistral based on a *Doyle* error, rather than a *Griffin* error.

16

| | |
|---|---|
| Prosecutor: | Let me rephrase my question. You never before today in open court told a police officer, a detective, a DA investigator, a Judge, anybody that this was an accident, correct? |
| Defense Counsel: | I would object to this. Talking to the DA, investigator, judge, I mean that is inappropriate people he could talk to. |
| The Court: | I am going to allow the question that he didn't stick around and tell anybody that it was an accident. I am going to allow that. But getting into specifics as far as law enforcement – well I am going to allow it because he was Mirandized and he did make a statement to law enforcement. |
| Defense Counsel: | My objection was to specifically the judge, DA, investigator. |
| The Court: | Okay. But he was interviewed by law enforcement. He did make a 911 call and so there were opportunities for him to say that and I will allow that examination. But regarding telling the judge, he has already got an attorney, so Miranda, he is not allowed to talk to anybody. But in those instances where he is allowed to talk to somebody and the fact that he didn't I am allowing that. Do you understand what I just said? |
| Prosecutor: | I believe so. |
| Prosecutor: | When you, let me word this correctly. You didn't stick around and tell police at the scene what happened, correct? |
| Petitioner: | Correct. |

*Ojeda*, (No. F069236), at 8. The prosecutor's questions referenced Petitioner's pre-arrest

statements to police officers after the shooting when Petitioner called the emergency operator.

During cross-examination, the prosecutor also asked, "And you never told law enforcement

that this was an accident, correct?" Petitioner replied, "I don't believe I did." *Ojeda*, (No.

F069236), at 9. During closing arguments, the prosecutor stated, "nothing supports his argument

that this was an accident except his self serving statement that he mentioned for the first time ever

on the stand today." *Id*. at 12. The prosecutor appears to have made overbroad statements that

impermissibly encompassed Petitioner's failure to state the shooting was an accident post- arrest

and after the invocation of his right to remain silent. Because the prosecutor's statements could

17

be construed to reference Petitioner's post-arrest silence, the Court will determine if any *Doyle* error at trial violated Petitioner's constitutional rights.

A *Doyle* error only entitles a petitioner to habeas relief if it "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 766 (1946)). For an error to have a "substantial and injurious effect or influence," it must have "affected the verdict." *O'Neil v. McAnnich*, 513 U.S. 432, 434 (1995).

The Court of Appeal found that any *Doyle* error was harmless. Analyzing the Court of Appeal's opinion, to determine whether a *Doyle* error constitutes harmless error, this Court must consider three factors: "[1] the extent of comments made by the witness, [2] whether an inference of guilt from silence was stressed to the jury, and [3] the extent of other evidence suggesting defendant's guilt." *United States v. Velarde-Gomez*, 269 F.3d 1023, 1034-35 (9th Cir. 2001) (quoting *United States v. Newman*, 943 F.3d 1155, 1158 (9th Cir. 1991)).

Here, the potentially improper questions by the prosecutor made up a small portion of the cross-examination. (*See* Lodged Doc. 17 at 3665-3690.) Subsequently, during closing arguments, the prosecutor made the statement "nothing supports his argument that this was an accident except his self-serving statement that he mentioned for the first time ever on the stand today."[5] *Id*. at 3758.

---

[5] The prosecutor also emphasized Petitioner did not state the shooting was an accident in pre-arrest statements:

> And again [Petitioner] never once mentioned the word "accident." When [Garza] came out of the house with the knife he didn't tell [Garza], I didn't mean to do it, it was a terrible accident. He didn't wait around for the police to show upon the scene to tell them when they came, oh my God, I did not mean for this to happen, it was a terrible accident. He never mentioned it on the 911 call once. Never said the word, "accident."

> And even when he was specifically asked by I believe it was Captain Rodriguez who was talking to him at that point and specifically said, "Why did you shoot your wife if you were trying to get back together with her? Why did you shoot her?" And at that point he could have said, I didn't mean to shoot her, it was an accident, but no, he didn't say that.

(Lodged Doc. 17 at 3759.) These statements clearly refer to Petitioner's pre-arrest statements; therefore, they are not part of the Court's *Doyle* analysis.

This statement was one statement in a longer closing argument, and the Court gave a curative instruction.

Additionally, as the Court of Appeal found, the evidence against Petitioner was overwhelming. The victim's son, Garza, was an eyewitness to the shooting and testified that Petitioner and Sanchez did not struggle over the gun before Sanchez was shot, suggesting the shooting could *not* have been an accident. Garza also testified that the two were not standing near each other at the time of the shooting. The evidence also showed that there was no stippling around Sanchez's wounds, which suggests the shots were not fired at close range, as would be expected if the gun fired accidentally while Sanchez and Petitioner struggled over it.

Before his arrest, Petitioner called 911 and spoke to an emergency operator, as well as several police officers. Petitioner never told any of those individuals that the shooting was an accident. During the call, Petitioner admitted that he shot Sanchez, stating, "I just shot my ex-wife," "I think I shot her," and when asked where he shot her, he stated, "I don't know, I thought I shot her in the stomach." *Ojeda*, (No. F069236), at 14-15. Petitioner also stated:

> She told me she loves me and she just needed time to get over the hurt and then she backstabbed me, she started dating some other [guys] she told me she wants nothing to do with me, and you know, I did everything she told me to do, I went in counseling, I quit doing all the bad things for her, for six months, and I was just really hurt, betrayed. . . . I just can't live without her. . . . That's pretty much, I just, I just can't live every day without her unless I'm drugged or drunk, I sleep all day, I sleep all night, I lost my business, I had a good lawn service, and now nothing cared, nothing I care about is being with her and being happy again."

*Id*. at 15. Although Petitioner had the opportunity to state the shooting was an accident, he never alleged that he struggled over the gun with Sanchez and the gun fired during the struggle. Petitioner did admit to the 911 operator and several police officers that he shot Sanchez.

Based on the foregoing evidence, the Court cannot say that the statements regarding Petitioner's silence post-arrest had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 622 (quoting *Kotteakos*, 328 U.S. at 766).

19

For these same reasons, Petitioner cannot show that his counsel rendered ineffective assistance of counsel by not objecting on *Doyle* grounds to the cross-examination, counsel's statements during closing arguments, and in the motion for mistrial. Petitioner cannot prove prejudice pursuant to *Strickland*. Because the evidence against Petitioner undermines his claim that the shooting was accidental, it is not reasonable to conclude that the outcome of the trial would have been different had counsel acted in the manner Petitioner requests. Therefore, Petitioner cannot prevail on his ineffective assistance of counsel claims and the Court recommends denying his petition for writ of habeas corpus.

## IV.   The Court Recommends Declining to Hold an Evidentiary Hearing

Petitioner requests the Court hold an evidentiary hearing. In habeas proceedings, "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). "It is axiomatic that when issues can be resolved with reference to the state court record, an evidentiary hearing becomes nothing more than a futile exercise." *Id.* at 1176. Here, Petitioner's claim can be resolved by reference to the state court record. Accordingly, the Court recommends denying Petitioner's request for an evidentiary hearing.

## V.   Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for

commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)   (1)   Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the Court recommends declining to issue a certificate of appealability.

## VI.    Conclusion and Recommendation

Based on the foregoing, the undersigned recommends that the Court dismiss the petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

//

21

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  __August 7, 2018__          _____ /s/ *Sheila K. Oberto* _____
                                          UNITED STATES MAGISTRATE JUDGE